

**ENTERED**
**03/21/2012**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

|  |  |  |
|---|---|---|
| IN RE | ) | |
| ALIREZA FARHANGKHAH, | ) | CASE NO. 10-35379-H3-7 |
| Debtor, | ) | |
| SAMUEL G. REYES, | ) | |
| Plaintiff, | ) | |
| v. | ) | ADV. NO. 10-3481 |
| ALIREZA FARHANGKHAH, | ) | |
| Defendant. | ) | |

<u>MEMORANDUM OPINION</u>

The court has held a trial in the above captioned adversary proceeding. The following are the Findings of Fact and Conclusions of Law of the court. A separate conforming Judgment will be entered. To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such. To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

<u>Findings of Fact</u>

Alireza Farhangkhah ("Debtor")[1] filed a voluntary petition under Chapter 7 of the Bankruptcy Code on June 30, 2010.

The sequence of events at issue in the above captioned adversary proceeding began in 2008.  Debtor, who had been employed as a field engineer by General Electric, was laid off from his job.  Debtor testified that, at the time that he lost his job, he had approximately $50,000 in savings.[2]

<u>Real Property Transactions</u>

During November and December, 2008, Debtor purchased real property at foreclosure sales.  Debtor testified that, on November 4, 2008, he purchased real property located at 1608 Brickarbor, Houston, Texas (the "Brickarbor Property"), in a tax foreclosure sale, for $31,500.  He testified that, approximately two days after the foreclosure sale, he contacted Rebecca Phillips, the record owner of the Brickarbor Property prior to the foreclosure sale.  He testified that Phillips paid him $30,000, two days after the sale, and paid an additional $1,500 approximately two weeks later.  He testified that Phillips paid a

---

[1]Debtor testified that he has also been known as Al Farhang. He testified that, during October, 2010, his name was legally changed to Al Frank.

[2]The dates on which Debtor worked are not in evidence. Debtor's statement of financial affairs reflects employment income of zero for 2010, $36,932 for 2009, and $39,894 for 2008. (Docket No. 1, Case No. 10-35379-H3-7).

redemption fee of $7,875 (reflecting 25 percent of the price Debtor paid at the foreclosure sale) during January or February of 2010.  He testified that he executed a quitclaim deed with respect to the property before he received the redemption fee.

          After Debtor's November, 2008 purchase and the quick redemption had resulted in a promised return of 25 percent,[3] Debtor invested in additional properties at foreclosure sales the next month.  On December 2, 2008, Debtor purchased the properties located at 3706 Nathaniel Brown (the "Nathaniel Brown Property"), 5105 Southwind (the "Southwind Property"), 2611 Canfield (the "Canfield Property"), and 6701 Stearns (the "Stearns Property") and 8713 Comal (the "Comal Property,") all located in Houston, Texas, in tax foreclosure sales.  Debtor also purchased the property located at 8243 Misty Ridge (the "Misty Ridge Property") in an execution sale, for foreclosure of a homeowners' association lien.

          Debtor paid $4,700 to purchase the Misty Ridge Property.  Debtor testified that, one day after the execution sale of the Misty Ridge Property, Debtor was contacted by William Gammon, purportedly on behalf of the homeowners' association that initiated foreclosure proceedings with respect to the Misty Ridge

---

[3]Under Tex. Tax Code § 34.21, the owner of real property sold at a tax foreclosure sale may redeem the property by paying the purchaser, inter alia, a redemption premium of 25 percent of the aggregate total spent by the purchaser.

3

Property.  Debtor testified that Gammon demanded the immediate turnover of the property, and loudly berated Debtor, within hearing of Debtor's family, when Debtor stated that he needed to research his rights.

Debtor testified that, approximately two weeks after his discussion with Gammon, he learned, after consultation with several attorneys, that the record owner of the Misty Ridge Property, Samuel G. Reyes ("Plaintiff") had a right to redeem the property by repaying to Debtor the $4,700 which Debtor had paid at the foreclosure sale, without paying a redemption fee.  He testified that he made several calls to Gammon, trying to arrange for the redemption, but that his calls were not returned.

Debtor testified that, during 2009, he was contacted by John Maher, the attorney for Plaintiff.  Debtor testified that, although he was prepared to permit Plaintiff to redeem the property, he was prevented from doing so by a restraining order obtained by Maher for Plaintiff.  Debtor testified that he presented an offer to permit a redemption of the property to Maher several times, but that Maher declined Debtor's offer.

The state court in which Plaintiff filed suit against Debtor found that Debtor had refused to accept the redemption payment, and failed to comply with Tex. Prop. Code § 209.011

until several months after Plaintiff filed suit.[4]  (Plaintiff's
Exhibit 4).  Debtor testified that, during the middle of 2009,
the state court ordered him to sign a deed transferring the Misty
Ridge Property to Plaintiff.  He testified that he did receive
$4,700 from Plaintiff.

After a trial held on February 22, 2010, the state
court awarded Plaintiff $13,735 in attorney fees, plus costs of
court and postjudgment interest.  The state court's findings of
fact and conclusions of law were signed on February 23, 2010.
(Plaintiff's Exhibit 4).  The state court's final judgment was
signed on March 31, 2010.  (Plaintiff's Exhibit 5).

The documents with respect to Debtor's purchases of the
Nathaniel Brown Property (Exhibit D-1), the Southwind Property
(Exhibit D-2), the Canfield Property (Exhibit D-3), the Stearns
Property (Exhibit D-4), and the Comal Property (Plaintiff's
Exhibit 10) are in evidence.

Debtor purchased the Nathaniel Brown Property on
December 2, 2008, for $14,000.  Debtor testified that, before he
purchased the property at the tax foreclosure sale, he had not

---

[4]Tex. Prop. Code § 209.011 governs redemption after a sale
of real property foreclosing a property owners' association's
assessment lien.  Unlike Tex. Tax Code § 34.21, Tex. Prop. Code
§ 209.011 does not provide for a redemption premium.  Tex. Prop.
Code § 209.011(f) requires, inter alia, that if a lot owner
redeems the property, the purchaser shall immediately execute and
deliver to the owner a deed transferring the property to the
redeeming lot owner.

seen the property.  He testified that, after the sale, he visited the property.  He found that the roof had fallen into the living room, making it impossible to use the door of the home.  He testified that the house on the property was condemned.  He testified that he sold the Nathaniel Brown Property for $14,000, on March 5, 2010.  He testified that, after paying broker fees, taxes, and other fees on the sale of the property, he received $4,949.79, resulting in a net loss of approximately $10,050.

Debtor purchased the Southwind Property on December 2, 2008, for $3,200.  He testified that he was required to spend a small amount of money clearing trash from the property.  He testified that he sold the Southwind Property for a gross sale price of $5,000, on January 15, 2010.  He testified that, after paying taxes and fees at closing, he received $3,307.81, resulting in a net gain of approximately $8.

Debtor purchased the Canfield Property on December 2, 2008, for $7,800.  He testified that he spent approximately $2,500 to fix damage to the property from Hurricane Ike.  He testified that he sold the Canfield Property on August 28, 2009 for $27,000.  He testified that, after paying taxes and fees, he received $8,000 in cash, and a note for $12,000, which was paid over the course of six months.

Debtor purchased the Stearns Property on December 2, 2008, for $12,200.  He sold the Stearns Property on May 11, 2009,

6

for a gross sale price of $17,500.  The settlement statement reflects that, after paying taxes and fees, Debtor received $13,765.76.  (Exhibit D-4).  Debtor's 2009 tax return reflects a net gain of $1,266 on the Stearns Property.  (Exhibit D-18).

Debtor purchased the Comal Property on December 2, 2008, for $14,500.  Debtor testified that, after he purchased the property at the foreclosure sale on Tuesday, December 2, 2008, he first visited the property on Saturday, December 6, 2008.  He testified that, although it had been represented to him at the foreclosure sale that there was a house on the property, the house had been demolished, leaving only a vacant lot covered in trash.  He testified that the home had burned prior to its demolition.

Debtor testified that, approximately one week after the foreclosure sale, he sought to determine when he would get a deed conveying the Comal Property to Debtor.  He testified that he learned that the property was encumbered by a lien for demolition costs in the approximate amount of $8,000 and by additional taxes in the approximate amount of $5,000.

The Harris County Appraisal District valued the Comal Property at $14,595 for 2010 and 2011.  (Exhibit D-12).  The Harris County Appraisal District valued the Comal Property at $65,313 for 2009.  (Plaintiff's Exhibit 16).  Debtor testified

that the 2009 value did not reflect the burning and demolition of the house that had been on the property.

Debtor testified that, on December 20, 2008, 18 days after he had purchased the Comal Property, he transferred the property to his sister, Mahin Farhang.  The transfer was not contemporaneously recorded in the real property records of Harris County, Texas.  The transfer was recorded in the real property records of Harris County, Texas nearly two years later, on February 23, 2010.

Debtor testified that he was prepared to surrender the Comal Property, but that Mahin Farhang requested that he transfer the property to her.  Debtor testified that Mahin Farhang planned to contend that the liens for demolition costs and taxes were extinguished by the tax sale of the property.  Debtor testified that he believed that the liens could not be avoided.

Debtor testified that he received "almost nothing" from Mahin Farhang, in exchange for the property.  The contract between Debtor and Mahin Farhang reflects a sale price of $10. (Plaintiff's Exhibit 10).

Debtor testified that his belief regarding the impossibility of avoiding the demolition and tax liens ultimately appeared to be proven correct.  He testified that Mahin Farhang offered to donate the Comal Property to an adjoining property owner.  He testified that the adjoining property owner, which

8

operates a church, refused the donation.  Debtor introduced into evidence a letter, dated January 14, 2012, from Rev. Rugley Monroe, Jr., of the El Bethel Missionary Baptist Church, stating that during 2010 Mahin Farhang had offered the property to the church.  Monroe states in the letter:  "Unfortunately, this property has over $9000.00 demolition lien and value for this property is way below the lien.  We are grateful for the offer but regretfully refused."  [sic] (Exhibit D-8).  Debtor testified that, ultimately, Mahin Farhang elected to surrender the property to the City of Houston.  He testified, however, that notwithstanding the recording of the deed transferring the property to Mahin Farhang and Mahin Farhang's surrender of the property, the City of Houston continued to bill him for the demolition fee and taxes on the property.

### Stock Transactions

Debtor's 2010 tax return reflects that Debtor purchased 2,001 shares of SMF Energy Corp. on August 31, 2009, for $3,045, and sold those shares on January 27, 2010, for $2,696, a net loss of $349.

Debtor's 2010 tax return reflects that Debtor purchased 1,000 shares of Citigroup Inc. on September 1, 2009, for $4,925, and sold those shares on January 28, 2010, for $3,245, a net loss of $1,680.

Debtor's 2010 tax return reflects that Debtor purchased 1,000 shares of Citigroup Inc. on October 28, 2009, for $4,215, and sold those shares on January 29, 2010, for $3,265, a net loss of $950.

<u>Gambling Losses</u>

On January 16, 2010, Debtor began gambling at the Coushatta casino in Louisiana.  Records from the casino indicate that Debtor gambled each day from January 16, 2010 through January 26, 2010, and also gambled on three days in February, 2010 and five days in April, 2010.  During this time period, Debtor lost an aggregate of $39,330 at the Coushatta casino. (Plaintiff's Exhibit 12).

Debtor appears to have spent an additional $3,220 at the L'Auberge casino in Louisiana during February, 2010.

Debtor testified that, after he had lost a significant portion of his savings on his real estate transactions, he tried to get his money back by gambling.  He testified that he took a big risk, and lost.

<u>Schedules and Statements</u>

Debtor's schedules indicate that he has no real property, and a very small amount of personal property.  Debtor listed no secured or priority claims.  He listed a total of $71,989.23 in unsecured claims.  The scheduled unsecured claims include a $14,000 claim for Maher, and $7,763.66 owed to the City

of Houston.  Debtor testified that the $7,763.66 unsecured debt to the City of Houston is based on the City's billing for the demolition fee on the Comal Property.

In Question No. 4 on Debtor's statement of financial affairs, Debtor identified as pending the suit filed by Plaintiff in state court.  Debtor did not identify as pending any other lawsuits.

On November 29, 2010, Harris County taxing authorities served on Debtor a notice of dismissal of a suit they had filed. The date of filing of the suit is not in evidence.  (Plaintiff's Exhibit 28).  Debtor testified that the suit had been dismissed before the date of filing of Debtor's Chapter 7 petition.

In Question No. 8 on Debtor's statement of financial affairs, Debtor identified as losses the $39,330 in gambling losses he incurred at the Coushatta casino.  He did not identify any losses at L'Auberge.

The instructions for Question No. 10. a. on Debtor's statement of financial affairs directed Debtor to:

> List all other property, other than property
> transferred in the ordinary course of the business or
> financial affairs of the debtor, transferred either
> absolutely or as security within two years immediately
> preceding the commencement of this case.  (Married
> debtors filing under chapter 12 or chapter 13 must
> include transfers by either or both spouses whether or
> not a joint petition is filed, unless the spouses are
> separated and a joint petition is not filed.)

(Docket No. 1, Case No. 10-35379-H3-7).

In Debtor's response to Question No. 10. a., Debtor listed the transfers of the Southwind Property, the Nathaniel Brown Property, the Canfield Property, and the Stearns Property.

In Debtor's response to Question No. 10. a., Debtor did not list the transfer of the Brickarbor property.  Debtor testified that he did not list the transfer because Rebecca Phillips' redemption of the property took place immediately.

In Debtor's response to Question No. 10. a., Debtor did not list the sales of stock.  Debtor testified that he did not list the sale of stock because his attorney advised him that it was not necessary in light of Debtor's losses on the sales of stock.

The instructions for Question No. 10. b. on Debtor's statement of financial affairs directed Debtor to:

> List all property transferred by the debtor within ten years immediately preceding the commencement of this case to a self-settled trust or similar device of which the debtor is a beneficiary.

(Docket No. 1, Case No. 10-35379-H3-7).

Debtor's response to Question No. 10. b. listed the transfer to Mahin Farhang.  In a column titled "Name of Trust or Other," Debtor identified Mahin Farhang.  In a column titled "Date(s) of Transfer(s)", Debtor identified that the deed was signed on 12/20/2008, and recorded on 2/23/2010.  In a column titled "Amount of Money or Description and Value of Property or Debtor's Interest in Property," Debtor listed $10.00.

12

<u>Adversary Pleadings</u>

In Plaintiff's second amended complaint, Plaintiff seeks denial of discharge, and a determination that Plaintiff's claim is not dischargeable.  Plaintiff's arguments for denial of discharge do not track the subsections of Section 727 of the Bankruptcy Code.  However, Plaintiff does allege that Debtor "fraudulently transferred numerous real estate assets," "made transfers of real property to insiders and family members immediately prior to filing," and that the "petition contained numerous inaccuracies for the sole purpose of avoiding discovery, delaying proceedings, and hiding assets."  Although Plaintiff cites Section 523(a)(2) for a determination of dischargeability, it is difficult to find any factual allegations in the complaint that support a contention that Plaintiff's debt is nondischargeable, and in the event, there was no evidence presented to support such a conclusion.  Additionally, in the prayer of the complaint, Plaintiff seeks an award of attorney fees, and a bar for Debtor's filing another bankruptcy case. Plaintiff does not cite authority for these grounds of relief. In his answer, Debtor denied the material allegations of the complaint, and requested an award of attorney fees.

<u>Discovery Issues</u>

On March 17, 2011, Plaintiff filed a motion to compel production of documents.  (Docket No. 25).  Debtor responded,

13

asserting that all documents in his possession had been forwarded
to Plaintiff's counsel, and that all of the pertinent information
had been disclosed to Plaintiff's counsel through the Section 341
creditors meeting.

This court held an evidentiary hearing on the motion to
compel, on July 26, 2011.  After the evidentiary hearing, this
court ruled, by order entered on September 2, 2011, that the
requested discovery had been produced.

Notwithstanding this court's ruling, Maher spent hours
conducting direct and cross examination of Debtor at trial,
attempting to relitigate the question of whether Debtor's
responses to discovery requests had been complete.  Additionally,
midway through trial, over six months after the evidentiary
hearing on the discovery issues, and over four months after this
court had ruled, Plaintiff filed a motion seeking a finding of
contempt, denial of discharge as a sanction, withdrawal of the
reference, and a criminal referral, all based on what Maher
asserted to be false testimony offered at trial by Debtor.
Plaintiff also filed a motion to reconsider this court's ruling
on discovery issues, (Docket No. 64).  Those motions lack
evidentiary support, and are denied.[5]

Demeanor of the Attorneys and Credibility of the Witnesses

---

[5]The court additionally notes that Debtor testified that,
for approximately two years, Maher has called or written to him
nearly daily, seeking additional discovery.

14

The court notes that Maher, who was essentially prosecuting the instant adversary proceeding for his own benefit (because the entire amount in controversy in the instant adversary proceeding consisted of Maher's attorney fees), repeatedly lectured Debtor during his direct and cross examination on Maher's view of the law, and, after approaching the witness with leave of court, frequently stood over the witness, asked questions in a loud and belligerent manner, and spoke over Debtor's answers.  He was several times instructed by the court to step away from the witness.  In addition, Maher belabored the questions about Debtor's answers to questions regarding the schedules and statement of financial affairs by repeatedly asking Debtor at length whether he had signed the schedules and statement of financial affairs, and whether he knew that they were signed under penalty of perjury.

Although English is not Debtor's first language, and Debtor was occasionally inaudible and less than confident on the witness stand, the court finds Debtor's testimony to be credible and competent with respect to the facts at issue and his mental state.  It is clear from Debtor's testimony that, while Debtor has some understanding of the law, his understanding of both the English language and the law is less than perfect.

The court finds the testimony of Ruth Liddil and Reese Baker to be competent and credible, but not probative of the

15

pertinent facts with respect to the instant adversary proceeding. The court finds the testimony of Fatomeh Jalalat not credible, and also not probative of the pertinent facts with respect to the instant adversary proceeding.[6]

### Creditor's Meeting Testimony

At the meeting of creditors pursuant to Section 341 of the Bankruptcy Code, Debtor testified regarding the reason for his filing of the instant Chapter 7 case, and as to the truth of the information contained in the schedules and statement of financial affairs.  On questioning from Maher at the meeting, Debtor testified that he transferred the four properties for fair market value.  Maher's questioning focused on the differences between the amounts listed in the statement of financial affairs (which Debtor testified were the amounts he received after sale of the properties, rather than the gross sale price) and the values listed for the properties by the Harris County Appraisal District.  Debtor testified at the meeting that the appraised value does not reflect the condition of the properties at the

---

[6]Debtor testified that Fatomeh Jalalat, who is one of Debtor's sisters and uses the name "Nina", was injured in a major vehicle accident in 2002.  He testified that both he and Mahin Farhang have powers of attorney to act for Ms. Jalalat.  It appears that Plaintiff called Ms. Jalalat as a witness primarily because Plaintiff, or Mr. Maher, believed that "Nina" was a name for Mahin Farhang, rather than for Ms. Jalalat.

16

time he acquired them.[7]   Debtor's testimony at the meeting of

creditors was generally consistent with his testimony at trial.[8]


Conclusions of Law

Section 523(a)(2) of the Bankruptcy Code provides in

pertinent part:

> (a) A discharge under section 727, 1141, 1228(a),
> 1228(b), or 1328(b) of this title does not discharge an
> individual debtor from any debt--
>
> * * *
>
> (2) for money, property, services, or an
> extension, renewal, or refinancing of credit, to
> the extent obtained by--
>
> > (A) false pretenses, a false representation,
> > or actual fraud, other than a statement
> > respecting the debtor's or an insider's
> > financial condition;

---

[7]The court notes that the properties were purchased in
November and December, 2008.  Hurricane Ike made landfall near
Houston, Texas in September, 2008.

[8]There was some evidence as to inconsistent descriptions of
Debtor's address.  In Debtor's petition, he listed an address of
15821 FM 529 #124, Houston, TX, 77095.  At the meeting of
creditors, Maher asked Debtor:  "What is the apartment number,"
to which Debtor replied, "124."  At trial, Debtor testified that
he has no home.  He testified that the address listed in the
petition is a private mail drop.  He testified that he sometimes
stays at the home of his sister, Fatomeh Jalalat, and sometimes
stays at the home of a friend.  The court does not infer from the
inconsistency in description of Debtor's address any intent to
mislead the court.  Debtor's response at the meeting of creditors
appears to reflect an incomplete understanding of the question
asked by Maher.

        (B) use of a statement in writing--

            (i) that is materially false;
            (ii) respecting the debtor's or an
            insider's financial condition;
            (iii) on which the creditor to whom the
            debtor is liable for such money,
            property, services, or credit reasonably
            relied; and
            (iv) that the debtor caused to be made
            or published with intent to deceive.

11 U.S.C. § 523(a)(2).

        In the instant adversary proceeding, Plaintiff presented no evidence to support any contention that Debtor's debt to plaintiff should be excepted from discharge pursuant to Section 523(a)(2) of the Bankruptcy Code.  The court concludes that the relief requested pursuant to Section 523(a)(2) of the Bankruptcy Code should be denied.

        Section 727(a) of the Bankruptcy Code provides in pertinent part:

        (a) The court shall grant the debtor a discharge,
        unless--

                    * * *

        (2) the debtor, with intent to hinder, delay, or
        defraud a creditor or an officer of the estate charged
        with custody of property under this title, has
        transferred, removed, destroyed, mutilated, or
        concealed, or has permitted to be transferred, removed,
        destroyed, mutilated, or concealed--

            (A) property of the debtor, within one year before
            the date of the filing of the petition; or
            (B) property of the estate, after the date of the
            filing of the petition;

                    * * *

18

       (4) the debtor knowingly and fraudulently, in or in connection with the case--

           (A) made a false oath or account;
           (B) presented or used a false claim;
           (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
           (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

       (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727(a).

At the trial on a complaint objecting to discharge, the plaintiff has the burden of proving the objection.  Rule 4005, Fed. R. Bankr. P.

Although it is not entirely clear from Plaintiff's complaint, it appears that Plaintiff contends that, under Section 727(a)(2) of the Bankruptcy Code, Debtor's transfer of the Comal Property to Mahin Farhang was made with intent to hinder, delay, or defraud Plaintiff.

Evidence of actual intent to defraud creditors is required to support a finding sufficient to deny a discharge. Matter of Reed, 700 F.2d 986 (5th Cir. 1983).  Actual intent may be inferred from the actions of the debtor and may be proven by

circumstantial evidence.  <u>Matter of Chastant</u>, 873 F.2d 89 (5th
Cir. 1989).

The Comal Property transferred by Debtor to Mahin
Farhang had a value of no more than $14,595.  There is some
evidence that the value of the property is less than $14,595.
The property transferred was encumbered by liens totaling at
least $13,000, and perhaps as much as $15,000.  While it is
possible that Mahin Farhang may have received property of a value
greater than zero, the evidence does not support an inference
that Debtor's transfer of the Comal Property to Mahin Farhang was
made to hinder, delay, or defraud Plaintiff.[9]

To the extent Plaintiff may have intended to assert
that the other transfers of property were intended to hinder,
delay, or defraud Plaintiff, those transfers appear to have been
for fair market value of the properties.  Plaintiff has not met
his burden of proof with respect to Plaintiff's allegations of
transfers with intent to hinder, delay, or defraud under Section
727(a)(2) of the Bankruptcy Code.

With respect to Section 727(a)(4), Plaintiff's
allegation that the "petition contained numerous inaccuracies for
the sole purpose of avoiding discovery, delaying proceedings, and

---

[9]Maher suggests that the timing of the recording of the
transfer, one day after the date of trial of Plaintiff's cause of
action against Debtor in state court, proves fraudulent intent on
Debtor's part.  The court does not infer fraudulent intent from
the timing of the recording of the transfer.

hiding assets" appears to allege that Debtor knowingly and
fraudulently made a false oath or account.  Maher also asserted,
in questioning Debtor at trial, that several inaccuracies
constituted such false oaths or accounts:  Debtor's listing of a
mail drop as an address on the petition; Debtor's listing of the
transfer to Mahin Farhang on Question 10. b. of the statement of
financial affairs; Debtor's omission from the statement of
financial affairs of the Brickarbor transaction; and Debtor's
omission of the stock transactions from the statement of
financial affairs.

     To prevail on a claim under Section 727(a)(4), the
Plaintiff must prove by a preponderance of the evidence that (1)
the debtor made a statement under oath; (2) the statement was
false; (3) the debtor knew the statement was false; (4) the
debtor made the statement with fraudulent intent; and (5) the
statement was material to the bankruptcy case.  In re Duncan, 562
F.3d 688 (5th Cir. 2009), citing Sholdra v. Chilmark Fin. LLP (
In re Sholdra), 249 F.3d 380 (5th Cir. 2001); Beaubouef v.
Beaubouef ( In re Beaubouef), 966 F.2d 174 (5th Cir. 1992).

     In the instant case, it is clear that the statements
made by Debtor in the petition, schedules, and statement of
financial affairs were made under oath.

     With respect to the question of whether any of the
statements were false, the petition directed the Debtor to list a

21

"Street Address of Debtor."  Debtor's listing of a mail drop is technically false, though Debtor's credible testimony is that he did not have a street address.  The listing of transfers in Question 10. a. clearly should have included the Brickarbor transaction.  Thus, Debtor's omission of the Brickarbor transaction makes his answer to Question 10. a. false.  Likewise, although Debtor disclosed the transaction with respect to the Comal Property, it appears it should have been included under Question 10. a. rather than 10. b., and thus both answers are false.  Debtor's stock transactions should have been listed in response to Question 10. a.  As a result, Debtor's response omitting the stock transactions was false.

Plaintiff presented no evidence on the question of whether Debtor knew that any of the statements were false.  It is clear that, as to the transaction with Mahin Farhang, Debtor attempted to disclose the terms correctly.  As to the street address listed in the petition, Debtor is able to read, and presumably was able to understand that the petition directed him to list his street address.  As to the Brickarbor transaction, Debtor's credible testimony is that he believed he was not required to list the Brickarbor purchase or sale, because the property was redeemed nearly immediately.  The court concludes that Debtor did not know that his statement of financial affairs was false as to its omission of the Brickarbor Property.  As to

22

the stock transactions, Debtor's explanation of his reason for omitting them from the statement of financial affairs does not negate his knowledge that the statement was false.

Circumstantial evidence may be used to prove fraudulent intent, and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent.  In re Duncan, 562 F.3d, at p. 695.

In the instant case, there is insufficient evidence upon which to infer fraudulent intent.  Debtor's credible testimony indicates that he attempted to get all the transfers listed on his schedules and statement of financial affairs, and failed to do so in several respects.  This court finds neither the omission of several transactions nor their timing probative of fraudulent intent on the part of the Debtor.

Moreover, there is no evidence that any of Debtor's omissions were material.  It does not appear that Debtor could have gained anything, or hidden any assets from the reach of creditors, by virtue of the few false/inaccurate statements in the schedules and statement of financial affairs.  The court concludes that Plaintiff has not met his burden of proof with respect to Plaintiff's allegations that Debtor knowingly and fraudulently made a false oath or account, under Section 727(a)(4) of the Bankruptcy Code.

23

With respect to an objection to discharge asserting a debtor's failure to explain satisfactorily any loss of assets, the initial burden of going forward with evidence is on the objector, who must introduce more than merely an allegation that the debtor has failed to explain losses.  Once the objector has introduced some evidence of the disappearance of substantial assets or of unusual transactions, the debtor must satisfactorily explain what happened.  The objector retains the burden of persuasion.  Matter of Chastant, 873 F.2d 89 (5th Cir. 1989).

In the instant case, Plaintiff made a prima facie showing of both a disappearance of assets and unusual transactions.  However, Debtor's explanation of those transactions was credible, and is satisfactory for the purposes of Section 727(a)(5) of the Bankruptcy Code.  Debtor clearly made some bad investments, and lost money gambling, but the bulk of Plaintiff's allegations are derived from Plaintiff's assertions as to the values of the parcels of real property Debtor transferred prior to the date of filing of the instant case.  The court finds that Debtor's testimony on the values of the properties was credible.  The court concludes that Debtor has satisfactorily explained the loss of his assets in the months prior to the filing of his Chapter 7 case.

### Attorney Fees

Defendant pled for an award of attorney fees in this adversary proceeding.  Generally, absent statute or an

enforceable contractual provision, litigants must pay their own attorney fees.  <u>Galveston County Navigation Dist. No. 1. v. Hopson Towing Co.</u>, 92 F.3d 353 (5th Cir. 1996).

Section 727 of the Bankruptcy Code does not provide for an award of attorney fees to a Debtor who prevails in defense of an objection to discharge.  <u>See</u> <u>In re Shahid</u>, 254 B.R. 40 (10th Cir. BAP 2000); <u>In re Baker</u>, 205 B.R. 125 (Bankr. N.D. Ill. 1997).

Section 523(d) of the Bankruptcy Code provides:

> (d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d).

Section 101(8) of the Bankruptcy Code defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8).  The debt incurred by Debtor to Plaintiff is not a consumer debt, but rather a debt arising as a result of litigation of a statutory tort claim by Plaintiff.  The court concludes that Section 523(d) does not provide a basis for an award of attorney fees.  The court concludes that Defendant is not entitled to an award of attorney fees.

Based on the foregoing, a separate conforming Judgment will be entered.

Signed at Houston, Texas on March 21, 2012.

LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE